25CA0444 Spangler v CDOC 07-30-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA0444
State Personnel Board 24B039

Gary Spangler,

Complainant-Appellee,

v.

Colorado Department of Corrections,

Respondent-Appellant,

and

State Personnel Board,

Appellee.

ORDER AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE FREYRE
Johnson and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 30, 2026

Law Offices of Gregory E. Givens, P.C., Gregory E. Givens, Colorado Springs, Colorado, for Complainant-Appellee

Philip J. Weiser, Attorney General, Eric Freund, Senior Assistant Attorney General, Dominick Schumacher, Assistant Attorney General, Denver, Colorado, for Respondent-Appellant

Philip J. Weiser, Attorney General, Jenna H. Anderson, Senior Assistant Attorney General, Denver, Colorado, for Appellee

¶ 1     After respondent, the Colorado Department of Corrections (the CDOC), terminated the employment of complainant, Gary Spangler, an administrative law judge (ALJ) reversed that termination.  And the State Personnel Board (the Board) then affirmed the ALJ's order.  The CDOC now appeals the Board's order.  We affirm.

## I.     Background

¶ 2     In 2015, the CDOC Office of the Inspector General (OIG) hired Spangler as a Criminal Investigator II.  Spangler's duties included detecting crime, enforcing the law, collecting and analyzing evidence and complaints, and planning and conducting complete criminal and administrative investigations.

¶ 3     Between 2015 and early 2023, the OIG's Chief Investigator, and Spangler's direct supervisor, was Grace Novotny.  Spangler received no disciplinary actions while working for Novotny and consistently received above average performance evaluations. Following Novotny's retirement in March 2023, Daniel Lake became the OIG Chief Investigator and Spangler's appointing authority.

¶ 4     In April 2023, Spangler applied for, but did not receive, a promotion within the OIG.  Spangler made Lake aware of his disapproval of Lake's decision.  In July 2023, Spangler was

1

relocated from CDOC headquarters in Colorado Springs to the Arrowhead Correctional Facility in Cañon City due to a "business need." Spangler packed up his office in boxes and placed the boxes in the trunk of his car. He drove to Arrowhead and unpacked the boxes in his new office. Unbeknownst to Spangler, evidence from two of his old cases (the 2017 "shank" case and the 2018 "suboxone" case) fell out of the boxes during the move and remained undiscovered in the trunk of his car.

¶ 5        In September 2023, Spangler was placed on administrative leave for unrelated allegations of misconduct. He returned all CDOC property before leaving, including his state-issued car. During the code of conduct investigation, CDOC Criminal Investigator Mike Barnett found evidence from two of Spangler's closed cases, the shank and suboxone cases, in the trunk of Spangler's car. The found evidence prompted Barnett to open a professional standards (PS) investigation. The PS investigation ended with the district attorney filing criminal charges against

Spangler for abuse of public records and second degree official misconduct.[1]

¶ 6    Shortly thereafter, Spangler received notice of a Rule 6-10 pre-disciplinary meeting (6-10 meeting), named such based on the applicable agency regulation number.  Lake conducted the meeting, and it was attended by Spangler and Warden Siobhan Burtlow.  Burtlow began the meeting by reading a summary of Barnett's PS investigation report.

¶ 7    Burtlow said, "By failing to file the cases with the District Attorney's Office and log and enter the evidence into OIG evidence, as noted within the OIG database; after noting within official reports that this had been completed, [you] may have violated" administrative regulations concerning crime scene management, evidence handling, and Brady reporting and disclosures.  Barnett reported that Spangler had entered the evidence into the CDOC's

---

[1] According to the public record, the last pleading filed was the district attorney's motion to dismiss, and the case was ordered sealed.  *See People v. Parks*, 2021 COA 61, ¶ 1 n.1 (we may take judicial notice of the contents of court records in related proceedings).

case management system at the time, the Inspector General Offense Reporting system (IGOR), but Spangler never noted how the evidence ended up in the trunk of his car.  Barnett also discovered that the district attorney's office assigned to the shank case had no record of the case being forwarded to it.  Barnett reported that Spangler accessed the IGOR case file in March 2022 but did not add any new information about the shank evidence's location.

¶ 8    Spangler explained that he stored the 2017 shank case evidence in the evidence locker of the Buena Vista Correctional Center (BVCC), then the CDOC headquarters' evidence locker when he was transferred to Colorado Springs, and then in boxes that were placed in the trunk of his car when he moved to the Arrowhead facility.  He said the evidence must have fallen out of its box, said he did not realize it was left in the trunk, and accepted responsibility for it.

¶ 9    Spangler further explained that he met in person with the district attorney about the shank case and that a no-file decision was made.  He reported this verbally to Novotny, who did not require that he do anything further.  Spangler said that neither "the e-File system" nor the EvidenceOnQ system existed in 2017.  As

4

part of the CDOC's investigation, Spangler asked Lake during the meeting to speak with Novotny about the procedures in place at that time to confirm. Spangler also identified Ava Heath and Adam Cummings as witnesses who could confirm the procedures that existed in 2017.

¶ 10 The 2018 suboxone case involved an envelope containing suboxone that was confiscated in the Cheyenne Mountain Reentry Center (CMRC) mailroom. Spangler's report said the case was closed due to lack of evidence and that the envelope with the suboxone strips was "labeled for destruction." His report was reviewed and approved by Novotny. In May 2019, the report was updated to add photographs of the evidence to the exhibits page. When the CMRC closed, Spangler placed the evidence in the evidence locker located at CDOC headquarters. When Spangler was required to move offices, he took the evidence with him. Later at the hearing before the ALJ, Spangler testified that he had verbally communicated with the district attorney about the case and the district attorney declined to file a case.

¶ 11 Several weeks later, Lake asked Barnett to interview Heath, Cummings, and Novotny. Lake never shared Spangler's

explanations with Barnett, nor did he believe Barnett needed to speak with Spangler. Barnett interviewed Heath and Cummings in addition to two other witnesses, but he never interviewed Novotny.

¶ 12 In a notice of disciplinary action dated January 3, 2024, Lake terminated Spangler's employment. The notice stated as follows:

> Based on all of the information I have received, including your statements at the [6-10] meeting, and PS Case 2023002840, I have reached the following conclusions:
>
> You reported in your OIG case reports for [the shank case and the suboxone case] that the evidence collected was placed into the OIG evidence (lockers). This is not accurate as the evidence was found in the trunk of your assigned vehicle and was not signed out of the OIG evidence storage. You stated in your typed case report [for the shank case] that the case would be forwarded to the District Attorney's Office. On October 26, 2023 Chief Barnett confirmed with the 11th Judicial District Attorney's Office, that there is no record of [the shank case], Dangerous Contraband, or homemade weapon [case] being submitted.
>
> Both aforementioned cases are Felonies in the State of Colorado. The statute of limitations in Colorado for the aforementioned cases is three (3) years. In addition, concerns about the evidence chain of custody seriously impact the ability to prosecute these cases, which negatively impacts both the victims and the Colorado Department of Corrections.

6

. . . .

> I have determined that you have violated the performance expectations as set forth in provisions of [CDOC] Administrative Regulations Code of Conduct 1450-01 Section IV., Subsubsections, A.1; A.3.; & A.8.;B. 1.; E. 1.; Administrative Regulation 1150-07, Crime Scene Management and Criminal Evidence Handling Section IV., Subsection D. 2.; J. 3. & J. 4.; K.1.& K.3.; Administrative Regulation 1150-20, Brady Reporting and Disclosures Section IV, Subsection A.; & D; and State Personnel Board Rule 6-12, 1, 3.

¶ 13    Spangler appealed to the Board.

¶ 14    In June 2024, an ALJ conducted an evidentiary hearing at which Lake, Barnett, Spangler, Novotny, Cummings, and Heath testified. The ALJ found that (1) the CDOC had not established, by a preponderance of the evidence, that Spangler had violated the administrative regulations alleged; (2) Spangler's conduct was in compliance with the OIG's practices under Novotny's supervision; and (3) Spangler's actions had been approved by Novotny. The ALJ found the termination decision was arbitrary, capricious, and contrary to rule or law, noting that a reasonable person would not conclude that Spangler's actions were so egregious as to warrant termination. The ALJ reversed Spangler's termination and awarded

7

him attorney fees. The CDOC appealed the ALJ's initial decision to the Board, which affirmed.

¶ 15    On appeal, the CDOC contends that the ALJ (1) erred in finding that Spangler did not commit the misconduct alleged; (2) misapplied the legal standard in deciding the termination was arbitrary, capricious, and contrary to rule or law; (3) violated the party presentation principle in finding that the administrative regulations cited by the CDOC were not applicable in 2017 and 2018; and (4) erroneously awarded attorney fees. We address and reject each contention.

## II.    Failure to Prove Misconduct

¶ 16    The CDOC contends the ALJ erred in finding that Spangler did not commit the acts for which he was terminated. We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 17    The Board is an administrative agency governed by the State Administrative Procedure Act, §§ 24-4-101 to -109, C.R.S. 2025. We may only reverse the Board's decision if it is arbitrary or capricious, unsupported by the record, contrary to law, or in excess of the Board's jurisdiction. *See* § 24-4-106(7)(b), C.R.S. 2025;

*Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1247 (Colo. 2001). Conversely, we must uphold the decision "if a consideration of the record as a whole reveals that the decision is supported by substantial evidence." *Dep't of Hum. Servs. v. State Pers. Bd.*, 2016 COA 37, ¶ 13. In conducting this review, we must accept the ALJ's factual findings unless they have no support in the record. *Id.* at ¶ 14.

¶ 18 As relevant here, certified state employees have a property interest in their positions and may only be disciplined for just cause based on constitutionally specified criteria. Colo. Const. art. XII, §§ 13-15; § 24-50-101, C.R.S. 2025; *Dep't of Corr. v. Stiles*, 2020 CO 90M, ¶ 23; *Dep't of Insts. v. Kinchen*, 886 P.2d 700, 707 (Colo. 1994). Colorado State Personnel Board Rules 6-10, 6-11, and 6-12, 4 Code Colo. Regs. 801-1, discuss employee rights and employer duties in cases involving disciplinary actions.

¶ 19 Rule 6-10 provides in pertinent part:

> C. When considering discipline, the appointing authority shall meet with the employee [a 6-10 meeting] before making a final decision . . . .

> D. During the Rule 6-10 meeting, the appointing authority shall:

9

1. Disclose the alleged performance issues or conduct that may result in discipline;

2. Disclose the source of the information about the alleged performance issues or conduct (unless prohibited by law); and

3. Give the employee an opportunity to respond to the alleged performance issues or conduct.

State Pers. Bd. Rule 6-10, 4 Code Colo. Regs. 801-1.

¶ 20    Rule 6-11 also provides in pertinent part the factors to consider in imposing discipline.  It provides:

The decision to take disciplinary action of a certified state employee shall be based upon:

1. The nature, extent, seriousness, and effect of the performance issues or conduct;

2. Type and frequency of prior unsatisfactory performance or conduct (including any prior performance improvement plans, corrective actions or disciplinary actions);

3. The period of time since any prior unsatisfactory performance or conduct;

4. Prior performance evaluations;

5. Mitigating circumstances; and

6. Information discussed during the Rule 6-10 meeting, including information presented by the employee.

State Pers. Bd. Rule 6-11(A), 4 Code Colo. Regs. 801-1.

¶ 21    Rule 6-12 provides in pertinent part:

>   A. Disciplinary actions are as follows: an adjustment of base pay to a lower rate in the pay grade; base pay below the grade minimum for a specified period not to exceed twelve (12) months; demotion; dismissal; and suspension without pay, subject to FLSA provisions. Administrative leave with pay during a period of investigation is not a disciplinary action.
>
>   B. Reasons for discipline include, but are not limited to, the following:
>
>   1. Failure to perform competently;
>
>   . . . .
>
>   3. Failure to comply with the Board Rules, Director's Procedures, department's rules and policies, state universal policies, or other departmental directives.

State Pers. Bd. Rule 6-12, 4 Code Colo. Regs. 801-1.

¶ 22    In the event a certified employee timely appeals an appointing authority's disciplinary action and requests a hearing, an ALJ may conduct the hearing on behalf of the Board. § 24-50-103(7), C.R.S. 2025. If an ALJ does so, the ALJ must make written findings of fact and conclusions of law and render an initial decision affirming, modifying, or reversing the disciplinary action. §§ 24-50-125(4), -125.4(3), C.R.S. 2025; *Colo. Dep't of Hum. Servs. v. Maggard*, 248 P.3d 708, 712 (Colo. 2011).

11

¶ 23    The employer carries the burden of proving, by a preponderance of the evidence, that the acts or omissions on which the discipline was based occurred and that just cause warranted the discipline imposed. *Kinchen*, 886 P.2d at 707-78. The Board may reverse or modify the employer's decision if the action is found to be arbitrary and capricious or contrary to rule or law. § 24-50-103(6); *Stiles*, ¶4 n.1.

## B. Additional Facts

¶ 24    At the hearing before the ALJ, Lake was questioned regarding Spangler's 6-10 meeting. In pertinent part, Lake said the following:

> [Counsel]: Did you tell Mr. Barnett what Mr. Spangler told you about his explanations for the evidence being in his trunk or why he didn't send the information to the DA in 2017?
>
> [Lake]: No, I don't believe I did. I just told Mr. Barnett that the question to ask is, what was the evidentiary — evidence practices in 2017 and 2018?
>
> [Counsel]: Just the evidentiary practices, right?
>
> [Lake]: Yeah. With the — how evidence was documented, collected, kept, and things like that. That was it. I gave him no other information.

12

¶ 25    Novotny was questioned about the procedures that existed for criminal investigators during the time Spangler handled the shank case and the suboxone case.  She stated that in 2017 and 2018, an investigator under her supervision would investigate a matter, write a case report in IGOR, note any physical evidence associated with that matter, and secure the physical evidence in either a correctional facility's evidence locker or the investigator's office evidence locker.  Every Colorado correctional facility relevant to this matter had an evidence locker where physical evidence was stored.  OIG investigators were responsible for maintaining their own physical evidence.

¶ 26    An investigator under Novotny's supervision who moved physical evidence from one location to another was not required to document that action in either IGOR or EvidenceOnQ.  Investigators under Novotny's supervision were not required to enter "nuisance" contraband into IGOR or EvidenceOnQ unless the contraband was part of a larger case.  Nuisance contraband included items that offenders were prohibited from having but would not be the subject of criminal prosecutions.  OIG investigators were not required to document a change in location of physical evidence.  It was up to

13

the individual investigators to keep track of their own evidence. If they chose to put the change in location in their notes or in a supplemental report, it was up to them. Nothing in IGOR required or necessitated updating because it was not an evidence tracking system.

¶ 27    Novotny opined that Spangler did not violate any agency rules or policies with regard to the shank case or the suboxone case. She also stated during cross-examination that she believed that Spangler's reports were complete.

> [Counsel]: You testified that you reviewed the report for criminal investigation in 2017 02485 regarding the shank and white powder.
>
> [Novotny]: Yes.
>
> [Counsel]: Okay. And in your belief, that report was complete?
>
> [Novotny]: Yes.
>
> [Counsel]: Okay. And you approved and closed the report?
>
> [Novotny]: I approved it. I didn't close it. It has to be closed before it comes to me.

¶ 28    Counsel also questioned Novotny about the suboxone case.

> [Counsel]: You also approved Mr. Spangler's report in criminal investigation 2018 001294 regarding the suboxone strips; is that correct?

14

[Novotny]: I believe so, yes.

¶ 29 Spangler also testified that he had taken the suboxone case to the district attorney, who decided not to file a case, and that he communicated that to Novotny.

> [Counsel]: With respect to the suboxone, did Ms. Novotny, who — who's your supervisor at that period — at that time?
>
> [Spangler]: That would have been Ms. Novotny.
>
> [Counsel]: Okay. Did she know that no criminal filings would be in that case?
>
> [Spangler]: Yes, she would have reviewed my report and saw [sic] that.
>
> . . . .
>
> [Counsel]: Okay. Tell me a little bit about the procedure for filing or no filing with the DA's Office in 2017. Can you tell us how that worked?
>
> [Spangler]: There are different ways to do it. If it is a major case, we would forward the whole case to the DA without asking permission, whether, you know, they wanted to file it or not. On the minor cases, someone like alcohol in the facility, there's standing rules that they won't even prosecute that. We already know about that, so we're not even going to waste our time asking about it. We'll just make a decision as to no file, move on our way. Some of the cases that are more murky, and I wasn't sure because like I said, I was only out there

15

for a three-month period during this period of time — first time I worked at Buena Vista.

[Counsel]:  Okay.

[Spangler]: So I wasn't familiar with all the rules.  So I contacted the DA on the cases and see what they wanted to do.

[Counsel]:  Was that something that was approved by your supervisor?

[Spangler]: Yes, and that was what I was taught to do . . . .

¶ 30     Novotny was also asked about the no-filing system at the time.

She responded in pertinent part,

[Counsel]:  Okay.  One of the charges that's being alleged against Mr. Spangler is that in his narrative in his report, he writes that the case is going to be referred to the 11th Judicial DA's Office for our — for referral — referred to it for prosecution.

[Novotny]: Okay.

[Counsel]:  Okay.  And ultimately, the case is not referred to the District Attorney's Office.

[Novotny]: Okay.

[Counsel]:  Okay.  Did that happen with your investigators from time to time?

[Novotny]: Yes.

[Counsel]:  Did it happen with Mr. Spangler?

[Novotny]: I would imagine it did.

16

[Counsel]: And one of the other allegations is that Mr. Spangler did not supplement his report by indicating that the DA was not going to file.

[Novotny]: Well, and there wouldn't — there isn't usually a supplemental report. It's usually done on the referral page of IGOR.

[Counsel]: Okay. Okay.

[Novotny]: And I will say that sometimes those things did fall through the crack [sic]. And if I could explain why that happened.

[Counsel]: Why did they fall through the cracks?

[Novotny]: Well, it's not so much falling through the cracks. It was more — a case like with the shank and that white substance, it's — in the IGOR case, you can open and close that case as many times as you need to, to add a supplement or to change or modify something. Most of the investigators, when they do something like that — and if I remember correctly, that shank was found — it wasn't in a common area, it was with that particular individual. So it's a pretty quick, open/close type case. So when you write the report, you're writing it all at one time.

[Counsel]: Okay.

[Novotny]: And I would say that initially when you look at that, that yeah, you're going to submit that to the DA for review.

17

[Counsel]: Would the — Mr. Spangler write that report, complete it, submit it to you for approval, and then he contacts the DA?

[Novotny]: Usually, yes.

[Counsel]: Okay. Would there be times where he would be writing his report and it'd be — and he was — contact the DA and receive word from the DA, prior to the completion of his report.

[Novotny]: Yes. I mean, that's what I'm saying is, that is a living document. It changes all the time. So it's — that may have been what he finished on that particular day when he wrote that report and then something changed after that — but he didn't go back in and update the report.

¶ 31 During the hearing, Cummings was asked whether keeping evidence inside a state-issued vehicle would violate the chain of custody. Cummings responded, "I don't think I've actually done that, but it would be acceptable to do that, yes."

## C. Analysis

¶ 32 The ALJ concluded, as a preliminary matter, that the CDOC had failed to admit into evidence the policies that were in effect at the time Spangler allegedly violated them. Instead, the CDOC admitted policies that went into effect on September 15, 2019, and February 15 and November 15, 2023. The ALJ concluded the

CDOC failed to meet its burden of proof because he was unable to find a violation of the policies in effect at the time the violations allegedly occurred and that this alone justified reversing the termination.[2]  Nevertheless, he decided the allegations on their merits, so we address each alleged violation of the 2023 regulations and conclude that the initial decision is also supported by the record.

¶ 33     The CDOC first alleged that Spangler violated DOC Admin. Reg. 1450-01(IV)(A)(1) (effective Nov. 15, 2023), which requires employees to avoid situations that give rise to direct, indirect, or perceived conflicts of interest.  Lake struggled to explain the conflict that the shank and suboxone cases created and testified that Spangler's failure to document the no-file decision in the shank case created a conflict of interest between him and the district attorney's office.  However, Novotny testified that such documentation was not required and that Spangler complied with

---

[2] The CDOC separately challenges this finding as a violation of the party presentation principle, which we address below.

the procedures in effect at the time. Moreover, the record showed that Spangler discussed the cases with the district attorney, who decided not to file charges. Accordingly, we conclude the record supports the ALJ's finding that no violation of this regulation occurred.

¶ 34     The CDOC next alleged that Spangler violated DOC Admin. Reg. 1450-01(IV)(A)(3), which requires employees to comply with administrative regulations, procedures, operational memorandums, implementation adjustments, rules, duties, legal orders, and administrative instructions. The ALJ found Novotny's firsthand testimony more credible than Lake's testimony, and we must defer to that finding. *Wal–Mart Stores, Inc. v. Indus. Claims Off.*, 989 P.2d 251, 252 (Colo. App. 1999) (citing *Dover Elevator Co. v. Industrial Claim Appeals Office*, 961 P.2d 1141 (Colo.App.1998).). Novotny testified that she was Spangler's supervisor in 2017 and 2018 and that Spangler never violated the provisions of this regulation with regards to the shank case or the suboxone case. Accordingly, we conclude that the record supports the ALJ's finding that no violation of this regulation occurred.

¶ 35    Next, the CDOC alleged that Spangler violated DOC Admin. Reg. 1450-01(IV)(A)(8), which requires employees to exercise good judgment and sound discretion at all times. Novotny testified that Spangler was an outstanding investigator who conformed to her expectations and CDOC policies during the handling of the shank and suboxone cases. Moreover, Spangler admitted that carrying evidence in the trunk of a car is not a good practice, but he explained that this was unintentional, he did not know the evidence had fallen from the boxes, and its location in the trunk was accidental. As well, Cummings confirmed that Spangler's action did not violate the chain of custody so long as the investigator could testify that it remained in a locked trunk until removed. Therefore, we conclude that the record supports the ALJ's finding that Spangler's accidental oversight of having the shank and suboxone evidence in his trunk did not constitute a violation of this regulation.

¶ 36    The CDOC next alleged that Spangler violated DOC Admin. Reg. 1450-01(IV)(B)(1), which provides:

> Any action on or off duty on the part of employees, contract workers, and volunteers that jeopardizes the integrity or security of the

21

> Department, calls into question one's ability to perform effectively and efficiently in their position, adversely affects public safety, casts doubt upon the person's integrity or which reflects discredit upon the individual as an employee, contract worker, or volunteer is expressly prohibited as conduct unbecoming and may lead to corrective and/or disciplinary action.

¶ 37 Lake testified that Spangler's failures to document the evidence in the evidence tracking system, submit the suboxone case for prosecution, destroy the suboxone evidence, and submit the shank case for prosecution jeopardized Spangler's and the CDOC's integrity and adversely affected the public's safety. In contrast, Novotny testified that

- Spangler entered the evidence into the system that existed at the time, conferred with the district attorney in the shank case and communicated the no-file decision to her;

- the district attorney at that time did not wish to document no-file decisions;

- in the suboxone case, there was insufficient evidence to submit to the district attorney; and

- Spangler otherwise complied with all procedures in both cases.

¶ 38    Because the ALJ credited Novotny's testimony over Lake's, we conclude that the record supports the ALJ's finding that Spangler did not violate this regulation.

¶ 39    Next, the CDOC alleged that Spangler violated DOC Admin. Reg. 1450-01(IV)(E)(1), which provides that employees will neither falsify any documents nor willfully depart from the truth either in giving testimony or in connection with any official duties or investigation.  Lake testified that Spangler violated this regulation in the shank case by reporting he would refer it to the district attorney for filing, failing to do so, and also failing to document his claim that there was a no-file decision.  Novotny testified that Spangler took the case to the district attorney and communicated verbally to her that there was a no-file decision.  She said he was not required to memorialize this decision in IGOR.  And she confirmed that at the time of that case, the district attorney's office did not wish to document its no-file decisions.  Accordingly, we conclude that the record supports the ALJ's finding that Spangler did not violate this regulation.

23

¶ 40    The CDOC next alleged that Spangler violated DOC Admin. Reg. 1150-07(IV)(D)(2) (effective Sep. 15, 2019), which provides the following:

> It is a criminal offense to conceal, destroy, or alter any physical evidence that may aid in a discovery, detection, apprehension, prosecution, corrective, or disciplinary action. Any contraband item or drug, as defined in this administrative regulation, is evidence of a crime and will be treated according to proper criminal evidence procedures, to include the proper reporting to an OIG investigator.

¶ 41    Lake testified that Spangler violated this regulation by not properly logging the evidence into IGOR or EvidenceOnQ and by keeping the evidence in the trunk of his car.  However, according to Novotny, Spangler was not required to document when he moved evidence from one location to another.  She also explained that the evidence was properly logged into IGOR and that both cases were closed with no identifiable suspects to prosecute.  Novotny explained that when EvidenceOnQ was implemented, the system automatically transferred the data from IGOR to EvidenceOnQ, which accounted for the four-month delay in the shank evidence appearing in EvidenceOnQ.  As well, Spangler testified that he did not know the evidence had fallen from the boxes into the trunk,

24

that he rarely accessed his trunk, and that he might not have seen it due to other items in the trunk. While Barnett testified that he took a photograph of the trunk, he never offered it into evidence. Therefore, we conclude that the record supports the ALJ's finding that Spangler did not conceal the evidence in his trunk and the ALJ's finding that no violation of the regulation occurred.

¶ 42 Next, the CDOC alleged that Spangler violated DOC Admin. Reg. 1150-07(IV)(J)(3), which requires that evidence be secured in the OIG criminal evidence storage area except when submitted for laboratory testing or use in court. Spangler testified that both the shank and the suboxone evidence were always secured in evidence lockers until they inadvertently fell into his trunk when moving to the Arrowhead facility. The ALJ found this allegation was proved by a preponderance of the evidence based on Spangler's admission. The ALJ further noted that this regulation was in effect at the time of the violation. Because the record supports a violation of this regulation, we affirm the ALJ's finding.

¶ 43 The CDOC next alleged that Spangler violated DOC Admin. Reg. 1150-07(IV)(J)(4), which requires that when a crime is committed, adjudicated and disposed of, the evidence must be

transferred to the master evidence/property depository maintained by the OIG Region II office in Cañon City and that it be disposed of only by the criminal evidence custodian when released by the appropriate district attorney or designee. Because the record shows that neither the shank case nor the suboxone case was adjudicated or disposed of, we affirm the ALJ's finding that this regulation is inapplicable and that the CDOC failed to prove it by a preponderance of the evidence.

¶ 44 Next, the CDOC alleged that Spangler violated DOC Admin. Reg. 1150-07(IV)(K)(1), which provides that dangerous evidence, including drugs and weapons, will be destroyed. However, this regulation provides no timeline or time limits for destruction. The ALJ found, and the record shows, that it would be too speculative to conclude that the evidence would not have been destroyed at a future date, and that the evidence's location in evidence lockers and the car trunk did not present a danger to anyone. Accordingly, we affirm the ALJ's finding that Spangler did not violate this regulation.

¶ 45 The CDOC next alleged that Spangler violated DOC Admin. Reg. 1105-07(IV)(K)(3), which requires that when evidence is

destroyed, it be documented on the chain of custody form and the AR Form 1105-07C, Evidence Disposal Record. Lake testified that because Spangler marked in IGOR that the suboxone was labeled for destruction, but had not been destroyed, this violated the regulation. But the plain language of the regulation pertains to evidence that is destroyed, not evidence that is labeled for destruction. And because the record shows that the evidence was never destroyed, we conclude it supports the ALJ's finding that Spangler did not violate this regulation.

¶ 46 Next, the CDOC alleged that Spangler violated DOC Admin. Reg. 1150-20(IV)(A) (effective Feb. 15, 2023), which provides that employees have an affirmative duty to conduct themselves in a manner which reflects honesty, integrity and truthfulness. Novotny testified that Spangler was not required to update the location of physical evidence when moved, including the shank and suboxone evidence. She also said he was never required to document the district attorney's no-file decision and that he did not violate any policy or regulation in his handling of the two cases. Furthermore, Cummings testified that he had known Spangler for twenty years in various capacities at the CDOC and that Spangler was the most

27

honest person he had met. Because the record supports the ALJ's finding that Spangler did not violate this regulation, we affirm his decision.

¶ 47    The CDOC next alleged that Spangler violated DOC Admin. Reg. 1150-20(IV)(D), which requires disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), of an employee's accepting or soliciting a bribe, engaging in unlawful conduct, sustaining a criminal conviction, engaging in or committing deceptive acts, or intentionally departing from the truth. The record contains no evidence relating to bribes, a criminal conviction, or unlawful conduct. Further, Novotny confirmed that Spangler did not falsify his report in the shank case because he referred the case to the district attorney by speaking with the district attorney personally, and that he was not required to update the report with the no-file decision. Additionally, nothing in the record contradicted Spangler's testimony that he did not know the evidence was in his trunk until it was found by Barnett. Accordingly, the record supports the ALJ's finding that no violation of the regulation occurred.

¶ 48    The CDOC last alleged that Spangler violated Board Rule 6-12(B) by failing to perform competently and by failing to comply with the Board Rules, Director's Procedures, department's rules and policies, state universal policies, or other directives.  State Pers. Bd. Rule 6-12(B)(1), (3).  The record shows that Spangler consistently received above-average performance evaluations and, according to Novotny, fully complied with her expectations and with the Department's regulations and policies.  Therefore, the record supports the ALJ's finding that Spangler did not violate this regulation.

¶ 49    Based on the foregoing, we discern no error in the ALJ's findings that Spangler did not commit all of the acts for which he was disciplined and affirm the Board's order on this basis.

### III.    Termination Decision

¶ 50    The CDOC next contends that the ALJ misapplied the standards for determining whether Spangler's termination was arbitrary, capricious, or contrary to rule or law.  We disagree and conclude that the record supports the ALJ's determination that Spangler was wrongfully terminated.

## A. Standard of Review and Applicable Law

¶ 51   An agency decision may be reversed only if the agency acted in an arbitrary and capricious manner, made a determination unsupported by evidence in the record, or exceeded its constitutional or statutory authority. § 24-4-106(7), C.R.S. 2025; *Ginny's Kids Int'l, Inc. v. Off. of Sec'y of State*, 29 P.3d 333, 335 (Colo. App. 2000). If we perceive no such error, the agency action must be affirmed. § 24-4-106(7)(a).

¶ 52   "In applying this standard, we presume the validity and regularity of administrative proceedings and resolve all reasonable doubts as to the correctness of administrative rulings in favor of the agency." *Gessler v. Grossman*, 2015 COA 62, ¶ 11, *aff'd*, 2018 CO 48. Ultimately, "[t]he burden is on the party challenging the agency action to overcome the presumption that the agency's acts were proper." *Wildwood Child & Adult Care Program, Inc. v. Colo. Dep't of Pub. Health & Env't*, 985 P.2d 654, 655 (Colo. App. 1999).

¶ 53   A "[c]apricious or arbitrary exercise of discretion" occurs when a decision-making body (1) "neglect[s] or refus[es] to use reasonable diligence and care" to procure evidence it is authorized to consider; (2) fails to "give candid and honest consideration to evidence before

30

it"; or (3) bases its decision on conclusions from the evidence that "reasonable persons fairly and honestly considering the evidence could not reach." *Rice v. Auraria Higher Educ. Ctr.*, 131 P.3d 1096, 1100 (Colo. App. 2005). "So long as the agency decision reflects conscientious effort to reasonably apply legislative standards to particular administrative proceedings, it is neither arbitrary nor capricious." *Moya v. Colo. Ltd. Gaming Control Comm'n*, 870 P.2d 620, 624 (Colo. App. 1994).

¶ 54 We also review de novo the agency's interpretations of law. *Citizens for Clean Air & Water in Pueblo & S. Colo. v. Colo. Dep't of Pub. Health & Env't*, 181 P.3d 393, 396 (Colo. App. 2008). But "[a]s part of our de novo review, 'we may consider and defer to an agency's interpretation of its own enabling statute and [of] regulations the agency has promulgated.'" *Gessler v. Colo. Common Cause*, 2014 CO 44, ¶ 7 (quoting *Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n*, 157 P.3d 1083, 1088 (Colo. 2007)); *see Chostner v. Colo. Water Quality Control Comm'n*, 2013 COA 111, ¶ 24 ("[A]lthough we are not bound by an agency decision that misapplies or misconstrues the law, we defer to an agency's interpretation of the statute or regulation it is charged with administering." (citing *El*

*Paso Cnty. Bd. of Equalization v. Craddock*, 850 P.2d 702, 705 (Colo. 1993)). An agency's interpretation is "most useful to the court when the subject involved calls for the exercise of technical expertise which the agency possesses." *Craddock*, 850 P.2d at 705.

## B. Analysis

¶ 55 We begin our review of Lake's decision with the first capricious-or-arbitrary-exercise-of-discretion factor and note that Lake was required to use reasonable diligence to procure all information and, under Board Rule 6-11, to consider this evidence prior to exercising his discretion to terminate Spangler. We discern no error by the ALJ in finding that Lake failed to use reasonable diligence to procure all information, for three reasons. First, during the 6-10 meeting, Lake never asked Spangler what the procedures were in 2017 and 2018 or how they differed from the regulations Spangler was claimed to have violated. Moreover, the ALJ noted that, at the hearing, Lake never submitted the administrative regulations in effect when the alleged violations occurred, demonstrating that he made little if any effort to ascertain the applicable policies and expectations regarding evidence handling and case reporting in effect in 2017 and 2018. Thus, the ALJ and

the Board were left with little choice but to find no violation, except for the one admitted to by Spangler.

¶ 56 Second, Lake never informed Barnett of Spangler's contentions or explanations during the 6-10 meeting, which precluded Barnett from fully developing his interviews with the witnesses he interviewed after the 6-10 meeting. Indeed, the hypotheticals Barnett presented did not mirror the facts or what Spangler claimed. Compounding this problem was Lake's suggestion that Barnett need not interview Spangler.

¶ 57 Third, Barnett never spoke with Novotny, who, as Spangler's direct supervisor in 2017 and 2018, possessed the best evidence of whether Spangler followed the applicable regulations and expectations. Barnett left messages for Spangler on a phone asking for Novotny's contact information, but that phone number was not Spangler's, and the record contains no evidence showing that Barnett undertook any other efforts to locate Novotny, beyond leaving unanswered messages, before submitting his interviews to Lake.

¶ 58 The second factor requires the ALJ to determine whether the appointing authority gave "candid and honest consideration" to the

33

relevant evidence and whether "reasonable [people] fairly and honestly considering the evidence must reach contrary conclusions." *Lawley*, 36 P.3d at 1252 (quoting *Van De Vegt v. Bd. of Comm'rs*, 55 P.2d 703, 705 (Colo. 1936)). This factor is satisfied if the "appointing authority considered, in good faith, the relevant evidence, including the evidence related to the factors that an appointing authority must consider under Rule 6-9 in exercising its discretion on disciplinary matters." *Stiles*, ¶ 47.

¶ 59 We discern no error in the ALJ's finding that Lake did not give candid and honest consideration to the relevant evidence for four reasons. First, Lake relied on Barnett's interviews following the 6-10 meeting, which, as described above, provided little useful information because they did not mirror the case facts or Spangler's explanations.

¶ 60 Second, Barnett failed to interview the most important witness with the most useful information, Novotny. And his only attempts to locate her were phone calls that went unanswered because she was out of the country without access to her phone.

¶ 61 Third, the record shows that Barnett's report did not accurately summarize information and often omitted exculpatory

information he received from the witness interviews. For example, he asked Cummings whether an investigator like Cummings would make a notation in the investigative narrative about evidence. Cummings said that he had filed cases where he had not mentioned the evidence and that there was no hard and fast rule on this point. He also said that just because a narrative did not mention the evidence did not mean he did not handle the evidence appropriately and that so long as he could testify about how the evidence had been handled, his chain of custody would be legally sound and acceptable. Barnett's report, however, stated that Cummings "confirmed the evidence location would have been documented in a narrative or IGOR, and eventually the new file on Q."

¶ 62    Another example was when Barnett also asked Cummings whether an investigator should drive around with evidence in the trunk of his car for extended periods of time. Cummings responded, "Yeah, I mean, I — well, I guess I — could tell you that as long as the evidence is secured somewhere and you can maintain your chain of [custody], I don't think it's best practice but it's not necessarily wrong." Barnett did not include this response in his report to Lake.

¶ 63 Barnett also downplayed Cummings' praise for Spangler. While he reported that Cummings said Spangler was the most honest person he knew, he never mentioned that Cummings had also indicated he had known Spangler for two decades and that Spangler had more integrity than anyone Cummings had worked with in his life. Barnett also did not include Cummings' statement that whatever Spangler was accused of doing, "[he] would doubt that with every cell in [his] core."

¶ 64 And Barnett interviewed two additional witnesses not provided by Spangler: Darren Cortese and Darren Adams. Neither witness had firsthand knowledge of the allegations because they were not supervised by Novotny in 2017 and 2018 and had no relevant experience with IGOR.

¶ 65 Fourth, Lake's disciplinary notice contained several statements that were contradicted by the hearing evidence. For example, it stated that Spangler delayed entering evidence in the shank case for four months. But the record shows that Spangler entered the evidence into IGOR in 2017 and that the information was migrated automatically to a new case management system,

EvidenceOnQ, in 2018. The migration thus caused the delayed date, not Spangler.

¶ 66 Another example was that Lake said Spangler took possession of the suboxone evidence five years before it was found in his trunk, implying that it was in the trunk for the entire time. This assumes facts that were not known at the time and that were contradicted by later evidence presented at the hearing showing the suboxone was stored at CMRC until it closed in 2020, when Spangler took possession of it.

¶ 67 Likewise, Lake alleged that Spangler was required to enter the suboxone into the OIG evidence database; however, Novotny said this was not required in 2018.

¶ 68 And Lake misstated Spangler's 6-10 meeting testimony by saying that Spangler reported he routinely accessed the trunk of his car, contrary to Spangler's actual testimony that he rarely accessed the trunk.

¶ 69 Lake's notice also stated that the current and former OIG investigators did not support or corroborate Spangler's assertions and actually disputed them. As described above, Barnett's report excluded or misreported much exculpatory information that

37

corroborated Spangler's contentions. Indeed, had Lake listened to the tapes of Barnett's interviews, rather than relying on Barnett's written summary, he would have known about and could have considered this exculpatory information.

¶ 70 Lake's notice also alleged that the shank and suboxone cases involved felonies subject to the three-year statute of limitations and that concerns with the chain of custody seriously impacted the ability to prosecute them, thereby negatively impacting the victims and the CDOC. But the record shows that the no-file decision was made in the shank case well before the statute of limitations ran and that insufficient evidence of a suspect's identity precluded the filing of charges in the suboxone case, a decision made before the statute of limitations had expired.

¶ 71 Accordingly, we conclude that ample evidence supports the ALJ's finding that Lake did not candidly and honestly procure and consider all relevant evidence in making his decision to terminate Spangler's employment.

¶ 72 Next, the third factor requires us to consider whether reasonable people fairly and honestly considering the evidence must reach a decision contrary to the appointing authority's, which

38

"assesses the appointing authority's weighing of the evidence and the reasonableness of the appointing authority's disciplinary action." *Stiles*, ¶ 52. Based on the hearing record, which established that Spangler violated only one administrative regulation in his handling of the shank and suboxone evidence, coupled with Lake's failure to obtain and consider highly relevant and exculpatory information from Novotny and other witnesses before making a disciplinary decision, we agree with the ALJ that reasonable people honestly considering this evidence would at most entertain the possibility of a corrective action for the single administrative regulation violation, but would not entertain termination.

¶ 73 Finally, we consider whether Spangler's termination was contrary to rule or law. *See* § 24-50-103(6). Notably, Board Rule 6-2 provides that a certified employee be subject to corrective action before discipline "unless the act is so flagrant or serious that immediate discipline is proper." State Pers. Bd. Rule 6-2, 4 Code Colo. Regs. 801-1. As noted above, the record shows only one violation of the CDOC's administrative regulations, and nothing in the record shows that holding evidence from long-closed cases in a

39

car trunk was so flagrant or serious as to warrant immediate discipline before corrective action. As noted by the ALJ, Spangler's unintentional act was inconsequential since neither case was prosecutable in 2023. Moreover, the record shows that Spangler's failure to document the evidence's location on an ongoing basis did not violate any regulation in 2017 and 2018 and that Spangler kept the evidence secured in lockers except for the time it was in his trunk.

¶ 74 Additionally, Board Rule 6-10(C) requires the appointing authority to meet with the employee before making a final decision. The record shows that following the 6-10 meeting, Lake never met with Spangler to discuss the results of the witness interviews before making his termination decision. The record also shows that Lake and Barnett referred the PS investigation report to the district attorney's office for the filing of charges on November 10, 2023, two weeks before scheduling the 6-10 meeting of November 27. This implies that Lake had already determined Spangler's culpability before conducting the 6-10 meeting.

¶ 75 Accordingly, we discern no error in the ALJ's finding that Lake's decision was contrary to rule or law or the ALJ's ultimate

40

finding that Lake's decision to terminate Spangler was arbitrary, capricious, and contrary to rule or law.

## IV. Party Presentation Principle

¶ 76 The CDOC next contends that the ALJ violated the party presentation principle when he found that the administrative regulations admitted into evidence by the CDOC were not applicable to the allegations against Spangler because Spangler never made this argument. We disagree and conclude that the ALJ reasonably inferred, from the properly admitted evidence, that the regulations did not apply to the allegations.

### A. Standard of Review and Applicable Law

¶ 77 Whether a judge's decision violated the party presentation principle is a question of law that is reviewed de novo. *See Greenlaw v. United States*, 554 U.S. 237, 243-44, 252 (2008).

¶ 78 The party presentation principle is a core component of our adversary system. *See id.* at 243 ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. . . . [A]s a general

41

rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.'" (citations omitted)); *Compos v. People*, 2021 CO 19, ¶ 35.

¶ 79　　The ALJ, as fact finder, weighs the evidence, determines the credibility of witnesses, and draws all justifiable inferences of fact from the evidence. *See People v. Reed*, 2013 COA 113, ¶¶ 46-47 (the fact finder is free to use its common knowledge and experience when assessing evidence); *People v. Perea*, 74 P.3d 326, 331 (Colo. App. 2002); *Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008).

### B. Analysis

¶ 80　　We discern no violation of the party presentation principle. While we acknowledge that Spangler never argued at the hearing that the 2023 regulations relied on by the CDOC were inapplicable to his case, the regulations spoke for themselves by containing an effective date. Thus, a fair reading of the regulations demonstrated that they were not in effect in 2017 and 2018. Because the fact finder must consider the evidence and reasonable inferences from that evidence in reaching a decision, the ALJ committed no error by finding that the admitted regulations did not apply to the

allegations at issue. And even assuming, *arguendo*, that the ALJ had erred, the CDOC was not prejudiced because the ALJ decided the allegations asserted against Spangler on their merits, not on the inapplicability of the regulations.

## V. Attorney Fees

¶ 81    The CDOC last contends that the ALJ erroneously awarded Spangler attorney fees that are unsupported. We disagree.

¶ 82    We review a court's award of attorney fees for an abuse of discretion and will reverse an award only if it is not supported by the evidence. *Spring Creek Ranchers Ass'n v. McNichols*, 165 P.3d 244, 246 (Colo. 2007).

¶ 83    Board Rule 8-51(B) provides the following:

> Upon final resolution of a proceeding under this Chapter 8, Resolution of Appeals and Disputes, Part A, attorney fees and costs may be assessed against a party if the Board finds that the personnel action from which the proceeding arose, or the appeal of such action was frivolous, in bad faith, malicious, a means of harassment, or was otherwise groundless.
>
> 1. Frivolous means that no rational argument based on the evidence or law was presented.
>
> 2. In bad faith, malicious, or as a means of harassment means that the appeal or defense was pursued to annoy or harass, made to be

> abusive, stubbornly litigious, or disrespectful
> of the truth.
>
> 3.  Groundless means that despite having a
> valid legal theory, a party fails to offer or
> produce any competent evidence to support
> the theory.

State Pers. Bd. Rule 8-51(B), 4 Code Colo. Regs. 801-1.

¶ 84    Additionally, section 24-50-125.5, C.R.S. 2025, permits an award of attorney fees and costs if a personnel action is "instituted frivolously, in bad faith, maliciously, or as a means of harassment or was otherwise groundless."  Even if a basis exists for imposing some level of discipline, whether a particular action is groundless focuses on the particular disciplinary action that was taken.  *Coffey v. Colo. Sch. of Mines*, 870 P.2d 608, 610 (Colo. App. 1993) (finding that while the evidence supported a three-day suspension, attorney fees were recoverable because the employer lacked grounds to discharge the employee); *see also Ehrle v. Dep't of Admin.*, 844 P.2d 1267, 1272 (Colo. App. 1992) (awarding attorney fees where the employer manipulated funding to make a prospective employee ineligible to fill the position and conducted a sham interview of that employee).

¶ 85 Based on the record before us, which shows that Spangler violated a single administrative regulation, we agree with the ALJ that the CDOC terminated Spangler without discovering and considering the true circumstances that existed in 2017 and 2018 and, thus, imposed discipline based on incomplete and flawed information. Accordingly, we discern no error in the ALJ's finding that the allegations disrespected the truth and were generally groundless, and we affirm the award of attorney fees and costs.

VI. Appellate Fees and Costs

¶ 86 Spangler requests appellate attorney fees and costs pursuant to C.A.R. 39, section 24-50-125.5(1), and Board Rule 8-51(B), which generally provide for appellate fees to a party who successfully defends the appeal. Because Spangler has prevailed on appeal, we award reasonable appellate fees and costs. Because this will require the presentation of additional evidence, we remand the case for a determination and award of reasonable attorney fees and costs.

## VII. Disposition

¶ 87 The order is affirmed, and the case is remanded to the administrative agency for the determination and award of reasonable appellate attorney fees and costs.

JUDGE JOHNSON and JUDGE KUHN concur.